IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUDOLPH MARSHALL,<br><br>     Petitioner,<br><br>  vs.<br><br>ANTHONY HEDGEPETH,[1] Warden,<br>Salinas Valley State Prison,<br><br>     Respondent. | No. 2:10-cv-00565-JKS<br><br>MEMORANDUM DECISION |

Rudolph Marshall, a state prisoner appearing *pro se*, filed a Petition for Habeas Corpus under 28 U.S.C. § 2254. Marshall is currently in the custody of the California Department of Corrections and Community Supervision, incarcerated at the Salinas Valley State Prison. Respondent has answered, and Marshall has replied. At Docket No. 31 Marshall filed a Motion for Appointment of Counsel.

## I. BACKGROUND/PRIOR PROCEEDINGS

Marshall was convicted by a jury in the Sacramento County Superior Court of two counts of kidnapping with the intent to commit robbery, Cal. Penal Code § 209(b)(1), two counts of second degree robbery, Cal. Penal Code § 211, two counts of carjacking, Cal. Penal Code § 215(a), two counts of possession of a firearm by a felon, Cal. Penal Code § 12021(a)(1), and one count of assault with a semi-automatic firearm, Cal. Penal Code § 245(b). The jury also found that Marshall had used a firearm in the commission of these offenses, Cal. Penal Code §§ 1203.06(a)(1), 12022.5(a), and 12022.53(b). In a separate trial the trial court found that Marshall

---

[1] Anthony Hedgepeth, Warden, Salinas Valley State Prison, is substituted for Larry Small, Warden, Calipatria State Prison. Fed. R. Civ. P. 25(d).

had been previously convicted of a serious felony, Cal. Penal Code §§ 667(b)-(i), 1170.12(a)-(d), and that he had served a prior prison term, Cal. Penal Code § 667.5(b).  The trial court sentenced Marshall to two consecutive terms of life with the possibility of parole, plus a determinate term of thirty-six years, four months.  The California Court of Appeal, Third Appellate District, affirmed Marshall's conviction and sentence in an unpublished decision,[2] and the California Supreme Court denied review on December 10, 2008.

On December 17, 2009, Marshall filed a petition for habeas corpus relief in the Sacramento County Superior Court.  The Sacramento County Superior Court denied the Petition in an unreported, reasoned decision on February 10, 2010.  Marshall timely filed his Petition for relief in this Court on March 7, 2010.  On March 17, 2010, Marshall filed a petition for habeas relief in the California Court of Appeal, which was summarily denied without opinion or citation to authority on March 25, 2010.  Marshall then filed a petition for habeas relief in the California Supreme Court on May 14, 2010, which was also summarily denied on May 20, 2010.

The facts underlying Marshall's conviction were recited by the California Court of Appeal:

**August 21, 2005—Counts 1-4**
On August 21, 2005, Jagdeep Johal was working the graveyard shift at the Penny Saver.  On his lunch break, at about 11:00 p.m., he drove to the California Bank and Trust on Broadway.  Johal deposited a paycheck of about $120 and withdrew $40 from his account.  He got back in his car and headed toward the freeway to go back to work.
While Johal was stopped at a traffic light on the way to the freeway, an Hispanic woman approached the passenger side of his car and started talking to him.  As she spoke with him, an African-American man, [Marshall], came up to the driver's side of the car and asked for a lighter.  Johal told him he did not have a lighter as he did not smoke, and [Marshall] pulled a semiautomatic handgun from his

_____

[2] *People v. Marshall*, No. C053405, 2008 WL 4483406 (Cal. Ct. App. Oct. 7, 2008).

pants, pointed it at Johal, and told him to turn off the car.  Johal offered [Marshall] his wallet and the car keys so they would leave him alone.  [Marshall] insisted Johal get into the back seat of the car.  [Marshall] and the woman got into the car, and [Marshall] drove away.  [Marshall] told Johal to keep his head down and threatened to shoot him.  They drove around for 20 to 30 minutes.

[Marshall] reached into the back, felt Johal's pockets, and pulled out Johal's wallet and a pocket knife Johal carried.  The woman went through Johal's wallet and took out his ATM card.  [Marshall] asked him for his PIN and threatened to shoot him if Johal gave incorrect information.  A few minutes later, they stopped at an ATM and tried to use Johal's ATM card.  They unsuccessfully attempted to withdraw $280 or $300, then $200, then $100, and then $80.  They did successfully withdraw $60 from Johal's account.

They drove around for another five to 10 minutes and then parked the car.  [Marshall] told Johal not to look up for 10 minutes or he would shoot him.  [Marshall] also told Johal he was going to throw his keys in the street, and after 10 minutes, Johal should pick up his keys, drive off, and not report the incident.  [Marshall] also took Johal's cell phone, and [Marshall] told him not to deactivate it so [Marshall] could use it.

Johal kept his head down and heard them get out of the car.  A few minutes later, he heard another car and people talking, and then he heard the car drive away.  He could not hear the people talking anymore, so he got out of the car, retrieved his keys, and left the area.  Johal and the car had been driven to the Fruitridge Road/Stockton Boulevard area.

Johal saw his wallet on the floor of the car, but the ATM card was gone.  His cell phone and pocket knife were also taken.  Johal spotted a police car, pulled up beside it, and told the officers he had just been carjacked.

About two months later, Johal was asked to look at a photographic lineup.  After being given the standard admonition, Johal immediately identified [Marshall] as the person who had carjacked him.  [Marshall's] fingerprints were also found on a manila envelope in Johal's car.

Johal's bank records showed a deposit of $126.45 and a simultaneous withdrawal of $40 were made on August 21, 2005, at 11:41 p.m.  About 20 minutes later, a withdrawal of $81.50 was made from an ATM identified in the bank records as North Florin.  Forty minutes after that, a $62 withdrawal was made from a Fruitridge Manor ATM.  Johal did not make the latter two withdrawals.

Surveillance tapes from the bank at Fruitridge Manor showed an African-American man and a Hispanic woman in the front seat of Johal's car.  While the woman was making the withdrawal from a drive-up ATM, it appeared the man was talking to someone in the back seat of the car.

[Marshall] denied kidnapping, carjacking, or robbing Johal.  He denied ever being in Johal's car, but could not explain how his fingerprints were in the car or on the envelope.  [Marshall] denied owning a chrome or black handgun.

**September 14, 2005-Counts 5-9**

On September 14, 2005, Jose Lara worked at the Olive Garden restaurant in the Arden Fair Mall area.  He had gotten off work around 11:00 p.m. and stopped at an ATM about 11:30 p.m. to get some cash on his way home.  The ATM was at Florin Road and Stockton Boulevard near the Florin Mall.  Lara parked his car and walked toward the ATM.

When he was about 13 feet away from the machine, two African-American men, one of them [Marshall], approached him and asked if he had a light.  Lara told them he did not have a light.  Then [Marshall] pulled out a semiautomatic handgun and pointed it at Lara.  [Marshall] told Lara to get in the back seat of his car and the two men got in the front seats, with [Marshall] driving.  [Marshall] reached into the back seat area and took the car keys from Lara.  Lara was told to put his head between his legs.  [Marshall] drove around for a while, parked, and asked Lara where his wallet was.  [Marshall] then took Lara's wallet from his pants pocket, took $60 from Lara's shirt pocket, and asked for Lara's ATM PIN.  Lara gave him the wrong number.

The other man got out of the passenger side of the car, and as Lara looked up he saw a blonde woman passing by the car.  Lara heard car doors opening and closing, and the other car drove away.  A few minutes later, [Marshall's] cell phone rang and Lara was again asked for his PIN.  After giving [Marshall] the incorrect number once again, Lara gave him the correct number.

[Marshall] then asked for the PIN for Lara's wife's credit card, which was in Lara's wallet.  Lara told him he did not know the number as it was not his card, and [Marshall] hit him in the head with the gun.  [Marshall] asked Lara if he wanted to die.  [Marshall] continued to speak on the cell phone, drove around for about 15 minutes, then stopped again.  [Marshall] got out of the car; Lara heard [Marshall] open the trunk and take his CD player out.

[Marshall] again asked Lara if he wanted to die and Lara answered, "No." [Marshall] told him he was going to leave, throw his keys in the street, and that Lara was not to get up until at least 10 minutes had passed.  [Marshall] then took an imitation fire extinguisher Lara had in his car, quarters from the ashtray, Lara's wallet, a ring his wife had given him, and his cell phone.  Lara heard another car pull up, doors opening and closing, and the other car driving away.

About 30 seconds after [Marshall] left, Lara retrieved his keys from the street and went home.  After informing the bank, credit card company, and cell phone provider that the cards and cell phone had been stolen, Lara and his wife went to a nearby sheriff's substation to report the crimes.

In the course of Detective Mike French's investigation of the case, he learned a Mary Walker might have been involved in the robbery.  French showed Lara surveillance images from the ATM that depicted Walker using the ATM at the time Lara's account was accessed.  Lara identified her as the woman he had seen walk by his car.  After being given the standard admonition, Lara was shown a photographic lineup and again identified Walker as the blonde woman who had walked by his car.  A few days later, in a live lineup, Lara once again identified Walker.  Lara was separately shown a photographic lineup that included [Marshall], and Lara identified

[Marshall] as the man holding the gun during the robbery.  Walker and [Marshall] were friends prior to [Marshall's] arrest in this case.

Transaction records from Lara's bank show that between 12:29 a.m. and 12:37 a.m. on September 15, 2005, there were multiple attempts to withdraw money from Lara's account.  There was an initial attempt to withdraw $500 at Wells Fargo's North Florin branch.  Then there was an account inquiry and a successful withdrawal of $300 at the same machine.  A few minutes later, still at the same location, there were two unsuccessful attempts to withdraw $100 and $40.  Then, at a Bank of America at Florin Mall, very close to the North Florin branch of Wells Fargo, there were two unsuccessful attempts to withdraw $302 and $102.  At 1:08 a.m., 1:16 a.m., and 1:19 a.m. there were three successful point-of-sale transactions for $7.01, $73.55, and $58.05, respectively.

Detective French later learned that the Sacramento Police Department had a similar case and [Marshall's] fingerprints had been recovered.  He also learned of a connection between Walker and [Marshall].  Using the same photographic lineup previously prepared by the Sacramento Police Department, French showed Lara the photo lineup and Lara identified [Marshall] as the person who had been armed during the robbery.  In a separate photographic lineup, Lara also identified the second suspect, who had been in the passenger seat.  After [Marshall] was arrested, Lara went to a live lineup that included [Marshall].  The people in the lineup were told to say, "What is your PIN number."  Based on his facial complexion, features, and voice, Lara identified [Marshall].

[Marshall] denied carjacking, kidnapping, robbing, or assaulting Lara.  [Marshall] denied owning a chrome or black handgun.  [Marshall] stated Walker was his ex-girlfriend.  He also acknowledged the woman depicted in the ATM surveillance photographs at Lara's bank "probably" looked like Walker.[3]

## II.  GROUNDS RAISED/DEFENSES

In his Petition Marshall raises four grounds for relief:  (1) ineffective assistance of counsel for failure to object to the consolidation of the two crimes; (2) prejudicial exclusion of evidence of third-party culpability; (3) ineffective assistance of counsel for failing to investigate and introduce an alibi witness; and (4) the fingerprint evidence was introduced in violation of his Sixth Amendment right to confrontation.  Respondent contends that Marshall's second ground

---

[3] *Marshall*, 2008 WL 4483406 at *1-4.

5

(exclusion of evidence) and third ground (failure to investigate alibi defense) are procedurally

barred.  Respondent raises no other affirmative defense.[4]

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States" at the time the state court renders its decision or "was based

on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."[5]  The Supreme Court has explained that "clearly established Federal law" in

§ 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the

time of the relevant state-court decision."[6]  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.[7]  Thus, where holdings of the Supreme Court

regarding the issue presented on habeas review are lacking, "it cannot be said that the state court

'unreasonabl[y] appli[ed] clearly established Federal law.'"[8]  When a claim falls under the

---

[4] Rules Governing Section 2254 Cases in the U.S. Dist. Courts, Rule 5(b) (2011).

[5] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[6] *Williams*, 529 U.S. at 412 (alteration added).

[7] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[8] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

"unreasonable application" prong, a state court's application of Supreme Court precedent must be "objectively unreasonable," not just "incorrect or erroneous."[9]  The Supreme Court has made clear that the objectively unreasonable standard is "a substantially higher threshold" than simply believing that the state-court determination was incorrect.[10]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[11]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[12]  Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[13]

The Supreme Court recently underscored the magnitude of the deference required:

As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  *Cf. Felker v. Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  *It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.*

---

[9] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[10] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

[11] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

[12] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[13] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.[14]

In applying this standard, this Court reviews the "last reasoned decision" by the state court.[15] State appellate court decisions that summarily affirm a lower court's opinion without explanation are presumed to have adopted the reasoning of the lower court.[16] This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court.[17]

Under California's unique habeas procedure, a prisoner who is denied habeas relief in the superior court files a new original petition for relief in the court of appeal. If denied relief by the

---

[14] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

[15] *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . .").

[16] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

[17] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

court of appeal, the defendant has the option of either filing a new original petition for habeas

relief or a petition for review of the court of appeal's denial in the California Supreme Court.[18]

This is considered as the functional equivalent of the appeal process.[19]  Under AEDPA, the state

court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption

by clear and convincing evidence.[20]  This presumption applies to state-trial courts and appellate

courts alike.[21]

A state court is not required to give reasons before its decision can be deemed to be

"adjudicated on the merits."[22]  When there is no reasoned state-court decision denying an issue

presented to the state, "it may be presumed that the state court adjudicated the claim on the

merits in the absence of any indication or state-law procedural principles to the contrary."[23]

"The presumption may be overcome when there is reason to think some other explanation for the

state court's decision is more likely."[24]  Where the presumption applies, this Court must perform

an independent review of the record to ascertain whether the state-court decision was

---

[18] *See Carey v. Saffold*, 536 U.S. 214, 221-22 (2002) (citations omitted) (discussing California's "original writ" system).

[19] *See id.* at 222 ("Thus, typically a prisoner will seek habeas review in a lower court and later seek appellate review in a higher court . . . .").

[20] 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . ." (citing 28 U.S.C. § 2254(e)(1))).

[21] *See Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004) ("Stevenson does not address these factual findings, let alone challenge them with clear and convincing evidence. Accordingly, we presume them to be correct." (citing 28 U.S.C. § 2254(e)(1); *Pollard v. Galaza*, 290 F.3d 1030, 1035 (9th Cir. 2002))).

[22] *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011).

[23] *Id.* (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

[24] *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

"objectively unreasonable."[25]   In conducting an independent review of the record, this Court

presumes that the relevant state-court decision rested on federal grounds,[26] giving that presumed

decision the same deference as a reasoned decision.[27]   The scope of this review is for clear error

of the state court ruling on the petition:

> [A]lthough we cannot undertake our review by analyzing the basis for the state
> court's decision, we can view it through the "objectively reasonable" lens ground by
> *Williams*. . . . Federal habeas review is not *de novo* when the state court does not
> supply reasoning for its decision, but an independent review of the record is required
> to determine whether the state court clearly erred in its application of controlling
> federal law.  Only by that examination may we determine whether the state court's
> decision was objectively reasonable.[28]

"[A]lthough we independently review the record, we still defer to the state court's ultimate

decision."[29]

---

[25] *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (quoting *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per curiam)).

[26] *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991) ("The presumption at present applies only when it fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law, that is, in those cases where a federal court has good reason to question whether there is an independent and adequate state ground for the decision."); *see also Harris*, 489 U.S. at 263.

[27] *Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[28] *Delgado v. Lewis* (*Delgado II*), 223 F.3d 976, 982 (9th Cir. 2000) (citation omitted). *But cf. Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) ("Our standard of review is not controlled by *Delgado v. Lewis* . . . . There, we held that where a state court provides no rational for a decision, a habeas court does not apply de novo review, but instead determines whether the state decision was objectively unreasonable based on its independent reading of the record.  Here, however, the state court was not silent as to its reasoning . . . .  Therefore, we review de novo whether Lewis waived his right to conflict free counsel . . . .").

[29] *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

IV.  DISCUSSION

**A.      Motion to Appoint Counsel**

There is no constitutional right to counsel in federal habeas proceedings.[30]  Appointment of counsel is not required in a habeas corpus proceeding in the absence of an order granting discovery or an evidentiary hearing.[31]  This Court may appoint counsel under the Criminal Justice Act in this case if the court determines that the interests of justice so require.[32]  In this case, the matter is fully briefed and ripe for submission to this Court for decision.  Consequently, appointment of counsel at this stage of the proceedings would serve no useful purpose.  Therefore, the Motion for Appointment of Counsel at Docket No. 31 will be denied.

**B.      Procedural Default**

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."[33]  This Court may not reach the merits of procedurally defaulted claims, that is, claims "in which the petitioner failed to follow applicable state procedural rules in raising the claims . . . ."[34]  Procedurally defaulted claims will not be considered in federal habeas proceedings unless the petitioner can demonstrate cause for the

---

[30] *See Lawrence v. Florida*, 549 U.S. 327, 336-37 (2007) (citing *Coleman*, 501 U.S. at 756-57).

[31] Rules Governing Section 2254 Cases in the U.S. Dist. Courts, Rules 6(a), 8(c) (2011).

[32] 28 U.S.C. § 2254(h); 18 U.S.C. § 3006A(a)(2)(B); *see Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983) ("In deciding whether to appoint counsel in a habeas proceeding, the district court must evaluate the likelihood of success on the merits as well as the ability of the petitioner to articulate his claims *pro se* in light of the complexity of the legal issues involved.").

[33] *Coleman,* 501 U.S. at 729.

[34] *Sawyer v. Whitley,* 505 U.S. 333, 338 (1992).

default and actual prejudice, i.e., a miscarriage of justice.[35]  To prove a fundamental miscarriage

of justice, Marshall must show that a constitutional violation probably resulted in his conviction

despite his actual innocence.[36]  Although at the gateway stage Marshall need not establish his

innocence as an "absolute certainty," Marshall must demonstrate that more likely than not, no

reasonable juror could find him guilty beyond a reasonable doubt.[37]

> If a petitioner has procedurally defaulted on a claim, a federal court may
> nonetheless consider the claim if he shows: (1) good cause for his failure to exhaust
> the claim; and (2) prejudice from the purported constitutional violation; or (3)
> demonstrates that not hearing the claim would result in a "fundamental miscarriage
> of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546; *Sawyer v. Whitley,* 505 U.S.
> 333, 339–40, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992).  An objective factor outside
> of a petitioner's control (e.g., ineffective assistance of counsel or a basis for the claim
> that was previously unavailable) could constitute cause. *Murray v. Carrier,* 477 U.S.
> 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *McCleskey v. Zant,* 499 U.S. 467,
> 497, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).  The petitioner can meet the prejudice
> prong if he demonstrates "that the errors . . . worked to his *actual* and substantial
> disadvantage, infecting his entire [proceeding] with errors of constitutional
> dimension." *White v. Lewis,* 874 F.2d 599, 603 (9th Cir.1989) (citing *United States
> v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)).  A petitioner
> can demonstrate a fundamental miscarriage of justice by "establish[ing] that under
> the probative evidence he has a colorable claim of factual innocence." *Sawyer,* 505
> U.S. at 339, 112 S.Ct. 2514 (quotation marks omitted).[38]

---

[35] *See Coleman,* 501 U.S. at 729.

[36] *See Schlup v. Delo,* 513 U.S. 298, 321-25 (1995) (linking miscarriages of justice to actual innocence); *United States v. Olano,* 507 U.S. 725, 736 (1993) ("In our collateral-review jurisprudence, the term 'miscarriage of justice' means that the defendant is actually innocent."); *Murray v. Carrier,* 477 U.S. 478, 496 (1986) ("[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.").

[37] *House v. Bell*, 547 U.S. 518, 538 (2006).

[38] *Cooper v. Neven*, 641 F.3d 322, 327 (9th Cir. 2011).

Ground 2:  Exclusion of Evidence of Third-Party Culpability

During the course of the investigations the sheriff's department had been investigating

similar incidents of carjacking and kidnapping involving suspects other than Marshall.  Marshall

contends that the trial court erred in excluding evidence of third-party culpability.  The California

Court of Appeal rejected Marshall's argument:

> "In general, third party culpability evidence is admissible if it 'rais[es] a
> reasonable doubt of defendant's guilt.' [Citation.] This does not mean, however, that
> no reasonable limits apply.  Evidence that another person had 'motive or opportunity'
> to commit the charged crime, or had some 'remote' connection to the victim or crime
> scene, is not sufficient to raise the requisite reasonable doubt.  [Citation.]  Under
> [*People v.] Hall* [(1986) 41 Cal.3d 826] and its progeny, third party culpability
> evidence is relevant and admissible only if it succeeds in 'linking the third person to
> the actual perpetration of the crime.' [Citations.]" (*People v. DePriest* (2007) 42
> Cal.4th 1, 43.)
>
> Third party evidence is treated like any other evidence.  (*People v. Hall*
> (1986) 41 Cal.3d 826, 834.)  Thus, a defendant must actually seek admission of
> evidence to preserve the issue on appeal.  (Evid.Code, § 354, subd. (a).)  At no time
> did [Marshall] proffer any evidence actually linking a third person to the perpetration
> of the crime.  Since [Marshall] did not seek admission of testimony or evidence on
> the issue of third party culpability, he forfeited any claim that it was improperly
> excluded. (*People v. Panah* (2005) 35 Cal.4th 395, 481; *People v. Valdez* (2004) 32
> Cal.4th 73, 108-109.)
>
> Furthermore, even if the issue were preserved and even if the trial court had
> erred, there would be no prejudice.  [Marshall's] original goal was "to explore the
> vagaries of Mr. Lara's various identifications in cross examination.  This will entail
> recounting some [of] the circumstances including questioning of the officers
> involved." [Marshall's] cross-examination of Lara and Detective French was not
> hindered or restricted.  He was fully able to explore such vagaries of identification
> on cross-examination.[39]

Although the ultimate burden of proving adequacy of a state procedural bar is on the

Respondent, once Respondent has "adequately pled the existence of an independent and adequate

state procedural ground as an affirmative defense, the burden to place that defense in issue shifts

---

[39] *Marshall*, 2008 WL 4483406 at *8.

to the petitioner."[40]   Marshall may satisfy his burden "by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule."[41]   In his reply, Marshall does not address the issue of procedural bar.  Thus, Marshall has failed to place the procedural bar defense at issue.  Because he is procedurally barred from raising it, Marshall is not entitled to relief under his second ground.  Moreover, the California Evidence Code section relied upon, § 354(a), is almost identical to Federal Rule of Evidence 103(a)(2), adopted by the Supreme Court.

<u>Ground 3:  Ineffective Assistance of Counsel (Alibi Defense)</u>

Marshall argues that his trial counsel was ineffective because counsel failed to raise an alibi defense as to the August 2005 (Johal) crime.  This question was raised in Marshall's state habeas proceedings.  Respondent contends that the Sacramento County Superior Court denied Marshall relief on the procedural ground that it was untimely.  Procedural default does not preclude federal habeas review unless the last state court rendering judgment in a case, clearly and expressly states that its judgment rests on a state procedural bar.[42]   Suffice it to say that, in this case, this Court's reading of the decision of the Sacramento County Superior Court leads it to conclude that, with respect to this ineffective assistance of counsel claim, it is not clear if that

---

[40] *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).

[41] *Id.*

[42] *Teague v. Lane*, 489 U.S. 288, 298-99 (1989) (citing *Harris v. Reed*, 489 U.S. 255, 262-63 (1989)).

claim was rejected on procedural grounds.[43]   Accordingly, this Court is not inclined to hold that Marshall's third ground is procedurally barred.

**C.     Merits**

Ground 1:  Ineffective Assistance of Counsel (Failure to Object to Consolidation)

Upon the motion of the prosecution, the trial court consolidated for trial both the August (Johal) and September (Lara) incidents.  The California Court of Appeal rejected Marshall's argument that trial counsel was ineffective for not objecting to consolidation, holding:

> For a defendant to prevail on a claim of ineffective assistance of counsel based on a failure to object to joinder or to seek severance, "he must show that reasonably competent counsel would have moved for severance, that such motion would have been successful, and that had the counts been severed an outcome more favorable to him was reasonably probable. [Citation.]" (*People v. Grant* (1988) 45 Cal.3d 829, 864-865.) [Marshall] has not met this burden.
>
> Under section 954, "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated . . . . [T]he court in which a case is triable, in the interest of justice and for good cause shown, may, in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."
>
> An accusatory pleading may charge two or more different offenses of the same class of crimes or offenses.  (*People v. Maury* (2003) 30 Cal.4th 342, 391 (*Maury* ).)  Two or more offenses of the same class may be tried together, even "where there is no cross-admissibility of the evidence." (*People v. Gomez* (1994) 24 Cal.App.4th 22, 29.)
>
> When the statutory requirements for joinder are met, the trial court may still order severance of the offenses upon a clear showing of prejudice.  "The factors to be considered are these:  (1) the crossadmissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the [Marshall]; (3) whether a weak case has been joined with a strong case or another

---

[43] The Superior Court's untimeliness ruling went to the "newly discovered" evidence Marshall submitted on November 23, 2009 as supporting his alibi defense and the affidavit of Enjoli Naverrete asserting that Marshall was with her the night of September 14-15, 2005.

weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case. [Citation.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 160-161 (*Mendoza* ).)

[Marshall] contends the evidence would not have been cross-admissible in separate trials. Because the charges involved violent activities, there was a risk of inflaming the jury by joining the charges. The Johal counts were significantly stronger than the Lara counts, in that independent evidence corroborated Johal's identification of [Marshall]. And, the joinder created the risk that the jury would aggregate all of the evidence and determine [Marshall] was the "*type* of person who was likely to have carjacked, kidnapped and robbed Lara."

The evidence was cross-admissible in separate trials. Evidence Code section 1101, subdivision (b) renders admissible evidence of prior acts in three general categories: identity, common design, and intent. The least degree of similarity between the uncharged act and the charged offense is required to prove intent. The greatest degree of similarity is required to prove identity. Somewhere in between falls evidence of a common design or plan. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403.) "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*Id.* at p. 403.)

Here, the evidence was that [Marshall] approached men late at night who were near an ATM machine and asked for a lighter. He then pulled a semiautomatic weapon out, demanded their keys, and forced them into the back seats of their cars. After getting their PIN's, he drove to multiple locations and a woman connected to him withdrew money from the victims' accounts. He went through their things in the cars and took their cell phones. As he left each victim, he threw his keys in the street and ordered him to wait 10 minutes before getting out of his back seat. He had another person available as he left to drive him away from the scene. These acts are sufficiently similar that they can be explained as "caused by a general plan" to carjack people who had just used or were about to use their ATM cards and withdraw as much money as possible from their accounts as quickly as possible by using the victims' cars to drive to different locations. (See *People v. Catlin* (2001) 26 Cal.4th 81, 111.)

The specific differences in the carjackings and kidnappings, such as the fact that there were different secondary players involved, does "not negate the basic similarity between the . . . incidents or render unreasonable the inference therefrom that [Marshall] acted according to a common design or plan. Rather, these differences affect the strength of the inference." (*People v. Dancer* (1996) 45 Cal.App.4th 1677, 1690, disapproved on other grounds in *People v. Hammon* (1997) 15 Cal.4th 1117, 1123.) However, even if the evidence was not cross-admissible, "the absence of cross-admissibility does not by itself demonstrate prejudice." (*Mendoza, supra,* 24 Cal.4th at p. 161.)

16

Contrary to [Marshall's] claims, neither of the cases was more inflammatory than the other, as each involved virtually identical facts.  (*People v. Geier* (2007) 41 Cal.4th 555, 576 (*Geier* ).)

Lastly, the evidence of one case was not "significantly weaker than the evidence of the other[] so as to create the danger of a 'spillover' effect that occurs when 'weaker charges [are] joined with strong charges so that the effect of the aggregate evidence might alter the outcome of the trial.' (*People v. Marshall* (1997) 15 Cal.4th 1, 28 [61 Cal.Rptr.2d 84, 931 P.2d 262].)"  (*Geier, supra,* 41 Cal.4th at p. 576.)  While it is true that the identification evidence in Johal's case was independently corroborated by fingerprint evidence, Lara's identifications of [Marshall], the identification of Walker withdrawing the money, and the relationship between [Marshall] and Walker were strong evidence that he was the perpetrator of the offenses.

Because the evidence was cross-admissible in a separate trial to prove common scheme or plan, there was no risk of inflaming the jury, and there was no joinder of a significantly weaker charge with a stronger one, [Marshall] has failed to establish prejudice from the joinder.  "[T]he trial court would not have abused its discretion by [overruling an objection to joinder or] refusing to grant a motion to sever had such a motion been made.  No reasonable probability existed that, had defense counsel moved for severance, the motion would have been granted.  Accordingly, [Marshall] has failed to establish prejudice from counsel's omission." (*Maury, supra,* 30 Cal.4th at p. 394.)[44]

Under *Strickland*, to demonstrate ineffective assistance of counsel, Marshall must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.[45]  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."[46]  Marshall must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.[47]  An analysis that focuses "solely

---

[44] *Marshall*, 2008 WL 4483406 at *4-6.

[45] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[46] *Id*.

[47] *Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."[48]  An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either one of the *Strickland* prongs.[49]

*Strickland* and its progeny do not mandate that this Court act as a "Monday morning quarterback" in reviewing tactical decisions.[50]  Indeed, the Supreme Court admonished in *Strickland*:

> [] Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  There are countless ways

---

[48] *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *see Strickland*, 466 U.S. at 687; *see also Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." (citing *Strickland*, 466 U.S. at 687)); *United States v. Cronic*, 466 U.S. 648, 656 (1984) ("The right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.  Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." (citations omitted)).

[49] *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

[50] *See Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990).

to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.[51]

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro, supra,* at 473, 127 S.Ct. 1933. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").[52]

It is through this doubly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d)(1) standard.[53]

The Supreme Court, applying the "doubly deferential standard," has made clear that when adjudicating ineffective assistance of counsel claims in federal habeas proceedings, unlike the situation on direct review, focus is not on whether counsel's performance fell below the *Strickland* standard. Rather, the focus is on whether the state-court decision holding that counsel was not ineffective constituted an "*unreasonable* application of federal law[,] [which] is different from an *incorrect* application of federal law."[54]

Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it

---

[51] 466 U.S. at 689 (internal citations and quotation marks omitted).

[52] *Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009).

[53] *Id.* (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

[54] *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (emphasis in the original).

must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.[55]

This Court cannot say that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[56]  Nor, viewing the matter through the doubly-deferential lens of *Mirzayance-Richter*, can this Court find that the state court unreasonably applied the correct legal principle to the facts of Marshall's case within the scope of *Andrade-Williams-Landrigan-Richter*; i.e., the state court decision was not more than incorrect or erroneous, its application of clearly established law was not objectively unreasonable.  Marshall has failed to establish that counsel committed any error that was so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment or that his defense was prejudiced, as required by *Strickland-Hill*.  In particular, Marshall has failed to overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Marshall is not entitled to relief under his first ground.

Ground 3:  Ineffective Assistance of Counsel (Failure to Investigate Alibi Defense)

Marshall testified at trial that at the time he allegedly kidnapped, carjacked, and robbed Lara in September 2005, he was with various women.  After the trial, a woman came forward with an affidavit attesting to the fact that Marshall was with her at the time of the alleged crime. Marshall argues that his defense counsel was ineffective in failing to investigate Marshall's alibi

---

[55] *Id.* at 786.

[56] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

defense.  In rejecting this claim, the Sacramento County Superior Court found: "To the extent

that [Marshall] claims that counsel's failure to investigate and present an alibi defense was

unreasonable, he has not shown that he ever informed counsel of the existence of an alibi

witness."[57]   Indeed, the very evidence submitted by Marshall to support his position, his

testimony at trial, is consistent with this:

> Q        Okay.  Where were you on the night of September 14th of 2005?
> A        September 14th.  I have no idea.
> Q        Do you know where you were at anytime between when you got out of jail
> on August 15th until the day you were arrested?
> A        Probably laying with a female somewhere.  I don't know.
> Q        Hanging out with a female somewhere?
> A.       (Nodded head)
> Q        Is that yes?
> A.       Yes.
> Q.       Okay.
> A.       Females with an S on the end.
> Q.       Females?
> A.       Yeah.
> Q        Okay.
> A        I have a lot of female friends.[58]

Marshall has failed to rebut the findings of the Sacramento County Superior Court by

clear and convincing evidence.[59]   Consequently, this Court cannot say that the decision of the

Sacramento County Superior Court was "contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States" or

"was based on an unreasonable determination of the facts in light of the evidence presented in the

---

[57] Lodged Doc. No. 9 at 3.

[58] Lodged Doc. 1 at 23-24.

[59] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

State court proceeding."[60]  Nor, viewing the matter through the doubly-deferential lens of *Mirzayance-Richter*, can this Court find that the state court unreasonably applied the correct legal principle to the facts of Marshall's case within the scope of *Andrade-Williams-Landrigan-Richter*; i.e., the state court decision was not more than incorrect or erroneous, its application of clearly established law was not objectively unreasonable.  Marshall has failed to establish that counsel committed any error that was so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment or that defendant's defense was prejudiced, as required by *Strickland-Hill*.  In particular, Marshall has failed to overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Marshall is not entitled to relief under his third ground.

Ground 4:  Violation of Sixth Amendment Right to Confrontation

During the investigation, fingerprints were recovered from the vehicle and a manila envelope involved in the August 2005 (Johal) incident.  The testimony of fingerprint technicians that those fingerprints matched Marshall's fingerprints was introduced at trial.  As part of the process of investigation, the fingerprints recovered were run against fingerprints maintained in the Automated Fingerprint Identification System ("AFIS"), which returned a "cold hit" identifying the prints as those of Marshall.  Marshall contends that, because no technician from AFIS testified as to the search or selection of fingerprints, his Sixth Amendment right to confrontation was violated.  The Sacramento County Superior Court rejected Marshall's claim:

> A laboratory report prepared for use in a criminal trial is "testimonial" under the meaning of <u>Crawford v. Washington</u> (2004) 541 U.S. 36; if the petitioner made

---

[60] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

a timely objection based on confrontation that was overruled, the introduction of a report without live testimony by the analyst who conducted the test violated the Confrontation Clause unless the analyst was unavailable and the petitioner had a prior opportunity to cross-examine the analyst.  (Melendez-Diaz v. Massachusetts (2009) 129 S.Ct. 2527, 2531-32.)

[Marshall] claims that he was denied the right of confrontation relating to fingerprint comparison evidence.  However, he admits that an expert testified that he or she compared at least one fingerprint found on an envelope from the victim's car with [Marshall's] fingerprints and concluded that they matched.  There is no indication that any report was admitted in violation of Melendez-Diaz.  [Marshall] complains that he was not able to examine the method by which [Marshall] was determined to be a suspect through a "cold hit."  He also complains that the evidence may have been compromised by the process of obtaining the latent prints.  How evidence is obtained or preserved are not matters that are addressed by Melendez-Diaz.  [Marshall] has not shown that he is entitled to any relief.[61]

"A witness's testimony against a defendant is . . . inadmissible unless the witness appears at trial, or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination."[62]  The right to confrontation only extends to testimonial statements, or put differently, the Confrontation Clause simply has no application to non-testimonial statements.[63]

[] Various formulations of this core class of testimonial statements exist: *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.[64]

---

[61] Lodged Doc. 9 at 3.

[62] *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2531 (2009) (citing *Crawford v. Washington*, 541 U.S. 36, 54 (2004)).

[63] *See United States v. Marguet-Pillado*, 560 F.3d 1078, 1085-86 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 755-56 (2009).

[64] *Crawford*, 541 U.S. at 51-52.

A fingerprint technician submitted the fingerprints to California's AFIS, from which a list of potential candidates, including Marshall, was compiled.  After comparing the fingerprints obtained from the car and the manila envelopes to the fingerprints on Marshall's fingerprint card, fingerprint technicians were able to identify the prints from the car and the manila envelopes as being those of Marshall.  Because AFIS had no application in this case after the list of potential candidates was compiled, Marshall's challenge appears to be limited to the use of AFIS to initially identify potential candidates.  The fatal flaw in Marshall's position is that AFIS, which is a repository of data, is not itself testimonial in nature.  The "testimony" is that of the fingerprint technician who utilized the information received from AFIS to narrow the search to determine the identity of the person whose fingerprints the technician found.  The AFIS "system" is a process by which fingerprint exemplars are compared for a match to the fingerprints of known persons stored in a data bank by use of a computerized system.[65]  In this case, the fingerprint technician did not even rely on the information in AFIS to make a "positive" identification of Marshall as the perpetrator.  Instead the technician compared the fingerprint information taken from the vehicle and the envelopes, and compared it to Marshall's fingerprint card.  No federal court, let alone the Supreme Court, has ever held that, in the context of the confrontation clause, it was necessary to introduce testimony concerning the method of using AFIS.

---

[65] The Court notes that at least one Court of Appeals has upheld fingerprint identification of a criminal defendant through the use of AFIS against a challenge under *Daubert v. Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (admissibility of scientific evidence). *United States v. Mitchell*, 365 F.3d 215, 220-51 (3rd Cir. 2004); *see Robinson v. City of Chicago*, 868 F.2d 959, 964 n.3 (7th Cir. 1989) (noting that AFIS "can accurately match up to one thousand fingerprints in a minute.").

Given the lack of Supreme Court decisions on point, this Court cannot say that the decision of the Sacramento County Superior Court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court rendered its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[66] Marshall is not entitled to relief under his fourth Ground.

---

[66] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

## V.  CONCLUSION AND ORDER

Marshall is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Motion for Appointment of Counsel at

Docket No. 31 is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of

Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.[67]  Any further request for a Certificate of Appealability must be addressed to the

Court of Appeals.[68]

The Clerk of the Court is to enter judgment accordingly.

Dated:  April 13, 2012.

                                        /s/ James K. Singleton, Jr.
                                        JAMES K. SINGLETON, JR.
                                        United States District Judge

---

[67] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))).

[68] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.